UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MARTECE ARIELLE SADDLER,<br><br>Defendant. | 4:19-CR-40109-KES<br><br><br>REPORT AND RECOMMENDATION |

**INTRODUCTION**

Defendant Martece Arielle Saddler is before the court on an indictment charging her with possession of a firearm by a felon and possession of an unregistered firearm. See Dkt. 1. Ms. Saddler has filed a motion to suppress certain evidence, namely a sawed-off shotgun seized during a warrant search of her apartment. See Dkt. 32. Ms. Saddler also seeks to suppress a statement she made to police about her ownership of the shotgun as fruit of the poisonous tree. See id. The United States ("government") resists the motion. See Dkt. 39. This matter has been referred to this magistrate judge for holding an evidentiary hearing and recommending a disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and the October 16, 2014, standing order of the Honorable Karen E. Schreier, district judge.

## FACTS

An evidentiary hearing was held on August 25, 2020.  Ms. Saddler was there in person along with her lawyer, Amanda Kippley.  The government was represented by its Assistant United States Attorney, Connie Larson, and Special Assistant United States Attorney, Mark Hodges.  Three witnesses testified and 12 exhibits were received into evidence.  From this testimony and these exhibits, the court makes the following findings of fact.

At approximately 1:07 p.m. on June 8, 2019, officers of the Sioux Falls Police Department were dispatched to a multi-unit two-story apartment building located at 120 N. Cliff Avenue in reference to a shooting that had just occurred.  At the scene, police found several victims with gunshot wounds, one of whom died from their injuries after being transported to the hospital. Officers performed a protective sweep of Unit 1 at 120 N. Cliff Avenue ("the apartment" or "Unit 1").  During the protective sweep, officers located Ms. Saddler within the apartment.  While in the apartment, which was on the second story, officers observed a security camera in the southwest-most south-facing window pointing toward the parking lot immediately south of 120 N. Cliff Avenue.  The security camera was visible from the parking lot.  After clearing the apartment, police secured it.  Police found three .40 caliber shell casings in the parking lot.

Detective Matt Dunn of the Sioux Falls Police Department responded directly to the Sioux Falls Police Department Law Enforcement Center to interview witnesses to the shooting.  One witness, Tenessa Carr, informed

2

Detective Dunn that her daughter, Christina Haney, lived in Unit 1 with Ms. Saddler. Ms. Carr, who lived in one of the apartments in the same apartment complex, saw approximately seven men in the parking lot shared by her building and 120 N. Cliff Avenue. Ms. Carr heard gun shots in the parking lot, then saw a group of men running away. Ms. Carr then heard additional gunshots.

Detective Dunn then interviewed Tracy Frisby. Ms. Frisby told Detective Dunn that she saw a man exit 120 N. Cliff Avenue, stand in the doorway, then begin firing a black semi-automatic handgun toward the group of men in the parking lot. Ms. Frisby then saw the shooter enter a dark-colored Buick sedan that was parked directly in front of 120 N. Cliff Avenue.

Detective Dunn went back to Ms. Carr to ask about the Buick. Ms. Carr told Detective Dunn that Ms. Haney was the primary driver, but not the registered owner, of a black Buick sedan, which was parked directly in front of the door to 120 N. Cliff Avenue before the shooting. Ms. Carr told Detective Dunn that the Buick was gone after the shooting. Ms. Carr also told Detective Dunn that other people often drove the black Buick.

Police learned that security cameras at the Dakota Auto Parts store, which is located directly across Cliff Avenue to the west of 120 N. Cliff Avenue, recorded video footage of the shooting. Detective Dunn reviewed the video footage and described it at the hearing on Ms. Saddler's motion to suppress. According to Detective Dunn, the footage showed a group of approximately

seven men[1] walk up to 116 and 120 N. Cliff Avenue and sit on a retaining wall just south of the buildings.  One of the men walked up to and entered 120 N. Cliff Avenue.  Then, the same man exited the building.  It is not clear from the video what he did inside the building or which apartment(s), if any, he visited. Shortly after the man returned to the parking lot, the shooter exited 120 N. Cliff Avenue and began shooting at the men in the parking lot.  One man from the group fell to the ground and the others began running.  The shooter stepped out of the doorway, adopted a shooting stance, and continued firing toward the fleeing men.  Then, the shooter entered a dark-colored Buick sedan parked in front of the door to 120 N. Cliff Avenue and drove away.  The video does not show which apartment within 120 N. Cliff Avenue the shooter exited.

Through their investigation, police learned that Ms. Haney was involved in a social media dispute with Jasmine Allen.  Two of the shooting victims were Ms. Allen's brothers. One of Ms. Allen's brothers reported to police that he and others went to 120 N. Cliff Avenue to settle the dispute with Ms. Haney.

Detective Dunn submitted this information in the form of an affidavit in support of search warrant to a magistrate judge for the South Dakota Circuit Court, Second Judicial Circuit.  The affidavit requested an order to search Unit 1 for the video camera located in the window, along with storage devices associated with the camera and its data.  The affidavit also requested an order authorizing the search of Unit 1 for items related to the social media dispute

---

[1] According to Detective Dunn's affidavit in application for search warrant, the video showed eight people in this group.  See Dkt. 33-2 at 2.

4

between Ms. Haney and Ms. Allen, including devices used to convey or store social media.  Lastly, the affidavit requested an order authorizing the search of Unit 1 for "any other item related to the crime of aggravated assault."  See Dkt. 33-2 at 3.  Detective Dunn testified that he understood this clause to refer to items related to the shooting that had just occurred at 120 N. Cliff Avenue.  He testified that examples of items related to the crime of aggravated assault might include registration or auto insurance documents referencing the Buick sedan the shooter drove from the scene, or any information about why the man from the group in the parking lot entered 120 N. Cliff Avenue.

At 5:57 p.m. that evening, the state court magistrate judge issued a search warrant for Unit 1.  The search warrant, which did not incorporate Detective Dunn's affidavit, authorized police to search the apartment "for video cameras, storage devices, any device used for social media and social media storage and any other item related to aggravated assault."  See Dkt. 33-1 at 2. As for probable cause, the search warrant stated that, based upon Detective Dunn's affidavit, "there is probable cause to believe that the property described herein may be found at [the apartment] and the property is: Evidence of the commission of a criminal offense, to wit: Aggravated Assault."  See id. at 1.  The magistrate judge signed both the search warrant (id. at 2) and Detective Dunn's affidavit.  See Dkt. 33-2 at 3.

Detective Dunn then delivered the search warrant to 120 N. Cliff Avenue, where he met with other Sioux Falls Police Department detectives and officers, including Officer Dustin Jorgensen.  Detective Dunn did not indicate whether

he also brought the signed affidavit to the scene.  Officer Jorgensen testified at
the hearing on Ms. Saddler's motion to suppress that he did not read the
search warrant, but Detective Dunn briefed him on what they were authorized
to look for in the apartment.  According to Officer Jorgensen, he understood
the scope of the search warrant authorized him to search the apartment for
electronic recording devices, to include cameras, cell phones, and SIM cards.
Because a SIM card was the smallest item they were searching for, Officer
Jorgensen believed he could search anywhere in the apartment as long as a
SIM card could fit there.  Officer Jorgensen also understood the search warrant
authorized them to search for storage devices.  When asked whether the
language of the search warrant would authorize him to search "storage devices"
generally, Officer Jorgensen responded, "sure."[2]

Together with other detectives and officers, Detective Dunn and Officer
Jorgensen entered Unit 1 to execute the search warrant.  On the north side of
Unit 1 were two bedrooms and a bathroom.  Officer Jorgensen searched the
middle bedroom while other officers collected the security camera in the
southwest window pointing at the parking lot.

Officer Jorgensen testified that he searched the closet in the middle
bedroom.  At the top of the closet was a shelf on which clothing and other
items were stacked.  Officer Jorgensen testified that, as he moved the clothes
on the right-hand side of the shelf to search within and underneath them, he
saw what appeared to him to be the grip of a firearm.  Officer Jorgensen

---

[2] Transcript of August 25, 2020, suppression hearing ("Hr'g Tr.") at 53.

testified that, in the interest of his safety and to continue searching the shelf, he took the firearm from the shelf, unloaded it, and placed it on the bed.  As he removed the firearm from the shelf, Officer Jorgensen testified that it appeared to him to be a sawed-off pump action shotgun.  He immediately recognized that the shotgun was too short to be legal.  Officer Jorgensen testified that, after he placed the shotgun on the bed, he notified his superiors that he had found a shotgun.

Officer Jorgensen testified that he is familiar with shotguns from his time in the Sioux Falls Police Department and growing up hunting.  Officer Jorgensen testified he knew that the minimum legal barrel length is 18 inches; without measuring the barrel of this shotgun, Officer Jorgensen testified that he knew the shotgun was "extremely short."[3]  Officer Jorgensen testified it appeared to him that the barrel had been sawed off just past the magazine. Officer Jorgensen testified that he also believed the shotgun's barrel had been sawed because it lacked a front sight at the end of the barrel, which he would have expected to see had the barrel not been shortened.

At the time he seized the shotgun, Officer Jorgensen did not know that Ms. Saddler had previously been convicted of a felony or whether the shotgun was registered to her.

Special Agent Kevin Wiese of the Bureau of Alcohol, Tobacco and Firearms testified at the hearing on Ms. Saddler's motion to suppress that the shotgun discovered by Officer Jorgensen in Unit 1 was sent to his office for

---

[3] Hr'g Tr. at 62.

examination and processing.  Agent Wiese testified that an examiner from his office measured the length of the shotgun's barrel by sticking a dowel down the barrel from the muzzle to the chamber while the chamber was closed. According to Agent Wiese, this method yields the most accurate measurement. Agent Wiese testified that the length of the shotgun's barrel was 16 $^{15}/_{16}$ inches, over one inch under the legal minimum.

Agent Wiese also testified that he, upon visually examining the shotgun, believed it to be readily apparent that its barrel was too short.  Agent Wiese testified that he was familiar with shotguns through his training and experience in the ATF and from growing up hunting.  Agent Wiese, like Officer Jorgensen, testified that the absence of a front sight at the end of the barrel indicated to him that the barrel had been shortened.

On June 12, 2019, police located and arrested Ms. Saddler and Ms. Haney in Idaho.  On June 20, 2019, Sioux Falls Police Department Detective Jonathan Carda interrogated Ms. Saddler.  During the videotaped interrogation, Ms. Saddler made incriminating statements, including an admission that the shotgun was hers.  See Dkt. 33-4 at timestamp 13:46:03-32.

## DISCUSSION

Ms. Saddler argues in her motion to suppress that the seizure of the sawed-off shotgun from her apartment violated her Fourth Amendment rights because (1) the search warrant was fatally unparticular, (2) the search warrant was not supported by probable cause, and (3) the plain-view exception to the

8

warrant requirement does not apply.  Ms. Saddler also seeks to suppress her June 20, 2019, statements to Detective Carda as fruit of the poisonous tree. For the following reasons, this magistrate judge recommends denying Ms. Saddler's motion to suppress.

## A.    Was the search warrant sufficiently particular?

"The Warrant clause of the Fourth Amendment provides that 'no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly* describing the place to be searched, and the persons or things to be seized.' (emphasis added)." United States v. Sigillito, 759 F.3d 913, 923 (8th Cir. 2014) (quoting U.S. Const. amend. IV)). Particularity prohibits the government from conducting "general, exploratory rummaging of a person's belongings." United States v. Saunders, 957 F.2d 1488, 1491 (8th Cir. 1992) (quotation and citation omitted).  "To satisfy the particularity requirement of the fourth amendment, the warrant must be sufficiently definite to enable the searching officers to identify the property authorized to be seized." United States v. Summage, 481 F.3d 1075, 1079 (8th Cir. 2007) (quotation and citation omitted).  The Fourth Amendment requires particularity in the search warrant, not in supporting documents like an affidavit or application.  Groh v. Ramirez, 540 U.S. 551, 557 (2004).

Here, the search warrant signed by the state magistrate judge did not include, by incorporation or expressly, the language contained in Detective Dunn's affidavit.  Detective Dunn's affidavit requests an order authorizing officers to search the apartment for the security camera in the window and

9

"collect all storage devices associated with this video camera and any devices related to storage of the data involving this camera." See Dkt. 33-2 at 3.  The affidavit also requests an order to search for "any item related to a dispute between Christina Haney and Jasmine Allen," specifically "any device used to convey social or store social media and any other items related to the crime of aggravated assault."  See id.  But the warrant authorized police to search Unit 1 "for video cameras, storage devices, any device used for social media and social media storage and any other item related to aggravated assault."  See Dkt. 33-1 at 2.  Ms. Saddler argues that the search authorized by the language in the warrant is fatally unparticularized.

The Fourth Amendment particularity requirement "can be satisfied by listing the items to be seized in the warrant itself or in an affidavit that is incorporated into the warrant."  United States v. Szczerba, 897 F.3d 929, 937 (8th Cir. 2018) (citing United States v. Hamilton, 591 F.3d 1017, 1024 (8th Cir. 2010)).  The Supreme Court has held that a warrant incorporates an affidavit "if the warrant uses appropriate words of incorporation, and if the supporting document accompanies the warrant."  Groh, 540 U.S. at 557-58.  See also United States v. Curry, 911 F.2d 72, 77 (8th Cir. 1990) (holding that "a description in the supporting affidavit can supply the requisite particularity if 'a) the affidavit accompanies the warrant, and b) the warrant uses suitable words of reference which incorporate the affidavit therein' " (quoting United States v. Strand, 761 F.2d 449, 453 (8th Cir. 1985))).

10

Here, the warrant did not incorporate Detective Dunn's affidavit. The warrant mentioned the affidavit only once—in its averment of probable cause. See Dkt. 33-1 at 1. Both the Supreme Court and the Eighth Circuit have found that a warrant does not incorporate a supporting affidavit when it merely states that the affidavit establishes probable cause. See Groh, 540 U.S. at 555, 558 ("recit[ing] that the Magistrate [Judge]was satisfied the affidavit established probable cause to believe that contraband was concealed on the premises" did not amount to incorporation); Strand, 761 F.2d at 453; Curry, 911 F.2d at 77; Szczerba, 897 F.3d at 937. Additionally, the record is unclear whether the affidavit accompanied the warrant to the search of the apartment.

So, the only way this warrant could satisfy the particularity requirement is if, in its four corners, it sufficiently identified the items to be seized. The constitutional standard for particularity of description in a search warrant is met if "the description is sufficiently definite so as to enable the officer with the warrant to reasonably ascertain and identify . . . the objects to be seized." United States v. Coppage, 635 F.2d 683, 686-87 (8th Cir. 1980) (quoting United States v. Muckenthaler, 584 F.2d 240, 245 (8th Cir. 1978)). "The degree of specificity required will depend on the circumstances of the case and on the type of items involved." United States v. Horn, 187 F.3d 781, 788 (8th Cir. 1999) (citing Strand. 761 F.2d at 453). "The particularity requirement 'is a standard of "practical accuracy" rather than a hypertechnical one.' " Summage, 481 F.3d at 1079 (quoting United States v. Peters, 92 F.3d 768, 769-70 (8th Cir. 1996)). If the individual goods to be seized cannot be more

11

precisely identified at the time the warrant is issued, naming only a generic class of items may meet the particularity requirement.  United States v. Johnson, 541 F.2d 1311, 1314 (8th Cir. 1976).

**1.    The "Video Cameras" Clause Is Unconstitutionally Overbroad.**

Ms. Saddler argues that the "video cameras" clause in the warrant is impermissibly overbroad.  This court agrees.  "Video cameras" is a generic class of items.  Generic classes of evidence are permissible only when more detailed description is impossible.  See Lebron, 729 F.2d at 536-37 ("[W]hen *it is impossible* to describe the fruits of a crime, approval has been given to a description of a generic class of items." (emphasis added) (citing Spinelli v. United States, 382 F.2d 871 (8th Cir. 1967), rev'd on other grounds, 393 U.S. 410 (1969))); United States v. George, 975 F.2d 72, 76 (2d Cir. 1992) ("A failure to describe the items to be seized with as much particularity as the circumstances reasonably allow offends the Fourth Amendment.").

Here, Detective Dunn's affidavit described with specificity the camera police suspected captured the shooting on video: "Officers saw in the window a video camera pointed southbound to the parking lot.  The video camera in the window was also visible by officers that were in the parking lot."  See Dkt. 33-2 at 3.  It was entirely possible for the warrant to precisely describe the security camera police wished to seize.  Yet the warrant did not.  Even under a standard of practical accuracy, the "video cameras" clause does not allow searching officers to reasonably ascertain the items they had probable cause to seize.  Therefore, "video cameras" is an impermissibly broad generic category.

## 2.    The "Storage Devices" Clause in the Warrant Is Unconstitutionally Overbroad.

The "storage devices" clause in the warrant fails the particularity requirement because it identifies only the physical item to be seized, not the underlying evidence or information police sought.  "[C]ases and commentary draw a distinction between the electronic storage device itself and the information which that device contains."  United States v. Vilar, No. S305CR621KWK, 2007 WL 1075041, at *36 (S.D.N.Y. Apr. 4, 2007).  For instance, when the government seeks to seize certain information stored on a computer, as opposed to the computer itself, that underlying information must be identified in the warrant with particularity and its seizure independently supported by probable cause.  See United States v. Carey, 172 F.3d 1268, 1275 (10th Cir. 1999) (holding, in the context of a warrant authorizing the search of a suspect's computer, "[o]fficers [should] specify in a warrant which type of files are sought"); United States v. Galpin, 720 F.3d 436, 449-50 (2d Cir. 2013) (holding that warrant which authorized police to search various computers and electronic storage devices was invalid because, "[w]hile those provisions describe the places to be searched, they do not describe with adequate particularity the 'items to be seized by their relation to designated crimes' " (quoting United States v. Williams, 592 F.3d 511, 519 (4th Cir. 2010))); In re Grand Jury Subpoena Duces Tecum Dated Nov. 15, 1993, 846 F. Supp. 11, 12 (S.D.N.Y. 1994) (holding, in the context of a grand jury subpoena, that specificity is required with respect to the categories of information requested, not merely the storage devices); United States v. Ricciardi, 405 F.3d 852,

862-63 (10th Cir. 2005) (internal quotation omitted) (holding that a warrant which "permitted the officers to search for anything—from child pornography to tax returns to private correspondence," was "precisely the kind of wide-ranging exploratory search that the Framers intended to prohibit"); United States v. Hunter, 13 F. Supp. 2d 574, 584-85 (D. Vt. 1998) (invalidating a warrant for failure to identify with particularity the underlying information to be seized); United States v. Wecht, 619 F. Supp. 2d 213, 247-48 (W.D. Penn. 2019) (collecting cases); cf. United States v. Houston, 754 F. Supp. 2d 1059, 1072-73 (D.S.D. 2010) (upholding warrant that authorized police to seize "computers," but also specified the underlying electronically stored information sought).

Requiring specificity as to the information sought, not the physical storage device, is consistent with Department of Justice guidelines. See COMPUTER CRIME AND INTELLECTUAL PROP. SECTION, CRIM. DIV., U.S. DEPT. OF JUSTICE, SEARCHING AND SEIZING COMPUTERS AND OBTAINING ELECTRONIC EVIDENCE IN CRIMINAL INVESTIGATIONS 70 (2009), available at https://www.justice.gov/sites/default/files/criminal-ccips/legacy/2015/01/14/ssmanual2009.pdf.  According to government policy, "[t]he most important decision agents must make when describing the property in the warrant is whether the seizable property is the computer *hardware* or merely the *information* that the hardware contains.  If computer hardware is contraband, evidence, fruits or instrumentalities of crime, the warrant should describe the hardware itself.  If the probable cause relates only to information, however, the warrant should describe the information to be

seized, and then request the authority to seize the information in whatever form it may be stored[.]"  Id.

Here, the warrant authorized seizure of physical "storage devices" without giving any indication what information the warrant sought.  Because users of electronic storage devices may—like computer users—"name, rename, and store files in ways that allow the 'files containing evidence of a crime [to] be intermingled with millions of innocuous files,' " warrants seeking information from electronic storage devices must specify the underlying evidence sought in order to satisfy the particularity requirement.  United States v. Hulscher, No. 4:16-CR-40070-01-KES, 2017 WL 1294452, at *5 (D.S.D. Feb. 10, 2017) (quoting United States v. Morgan, 562 Fed. Appx. 123, 128 (3d Cir. 2014)), adopted as modified, 2017 WL 657436 (Feb. 17, 2017).  Indeed, Detective Dunn testified that, according to his understanding of the warrant, "storage devices" could include not only SD cards and USB drives, but also cell phones, computers and laptops.[4]  The omission from the warrant of any description of the information sought on electronic storage devices, cell phones, computers,

---

[4] Hr'g Tr. at 26.

and laptops requires the conclusion that the clause authorizing police to seize

"storage devices"[5] is unconstitutionally overbroad.[6]

### 3. The Social Media Devices Clause Is Unconstitutionally Overbroad.

Similarly, the clause in the search warrant permitting police to search for

"any device used for social media and social media storage" is overbroad

because the warrant, on its face, contains no reference to what underlying

information or evidence police had probable cause to believe was stored on any

---

[5] The Court rejects Ms. Saddler's argument (made exclusively at the suppression hearing) that authorization to search "storage devices" is unconstitutionally overbroad because it authorizes police to search non-electronic and non-digital storage devices. In common usage, "storage device" typically refers to electronic storage devices, such as hard drives, USB drives, CDs, and SD cards. See United States v. Alexander, 574 F.3d 484, 587 (8th Cir. 2009) (using the unqualified term "storage devices" to refer to electronic storage devices, "such as hard drives and floppy disks"). The court is unpersuaded by Ms. Saddler's argument that "storage devices," as used in the search warrant, is so broad as to include storage *containers*, such as boxes, bins, and tubs. See United States v. Sturgis, 652 F.3d 842, 844 (8th Cir. 2011) ("When considering whether a search 'exceeded the scope of [a] warrant,' we 'look[ ] to the fair meaning of the warrant's terms.' " (quoting United States v. Johnson, 640 F.3d 843, 845 (8th Cir. 2011))). Further, it was clear to Detective Dunn, who prepared the warrant and participated in the warrant search, and Officer Jorgensen, who participated in the warrant search and discovered the shotgun, that the warrant's scope authorized the seizure of electronic storage devices, not storage containers.

[6] Detective Dunn's warrant, for its part, indicates that the underlying information police were seeking consisted of data associated with the security camera located in the apartment's southwestern window. See Dkt. 33-2 at 3. Detective Dunn explained at the suppression hearing that police sought this data because they believed this security camera may have captured the shooting, and the camera angle may have been better than the Dakota Auto Parts surveillance footage from across Cliff Ave. The level of specificity contained in the affidavit would probably satisfy the particularity requirement. However, as discussed above, the government cannot avail itself of information contained only in the affidavit because the warrant did not incorporate the affidavit.

such device.  Under the warrant, police seized not only four cell phones, but also an iPod, an Amazon Kindle, and a laptop computer.  <u>See</u> Dkt. 33-1 at 3-4. Similar to computers and electronic storage devices, devices used to convey social media (typically cell phones and, according to Detective Dunn, Kindles) allow users, through applications or otherwise, to "name, rename, and store files in ways that allow the 'files containing evidence of a crime [to] be intermingled with millions of innocuous files.' " <u>Morgan</u>, 562 Fed. Appx. at 128 (quoting <u>Galpin</u>, 720 F.3d at 447).  Although, in the context of internet-enabled devices, "courts have given police broad latitude in what is searched and seized, usually allowing police to copy entire hard drives," these seizures are lawful only when "the object of the search is adequately set forth in the search warrant."  <u>Hulscher</u>, 2017 WL 1294452, at *5 (collecting cases).

This Court recognizes that cell phones contain a great deal of personal information, most of which "is non-responsive to the reasons giving rise to probable cause for the search warrant in the first place." <u>Id.</u> at *6.  The Supreme Court, in 2014, described the nature of modern cell phones in <u>United States v. Riley</u>; the Court's description is no less salient six years later. "Modern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse." <u>Riley</u>, 573 U.S. 373, 393 (2014).  "The term 'cell phone' is itself misleading shorthand; many of these devices are in fact minicomputers that also happen to have the capacity to be used as telephones.  They could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums,

televisions, maps, or newspapers." Id. "Current cell phones can store millions of pages of text, thousands of photographs, and hundreds of videos." Hulscher, 2017 WL 1294452, at *6 (citing Riley, 573 U.S. at 394). "Cell phones, by amalgamating a variety of discrete data about the owner all in a single place, have the potential to invade the owner's privacy to a degree that could not be possible if just one variety of data were discovered." Hulscher, 2017 WL 1294452, at *6 (citing Riley, 573 U.S. at 394).

The "device[s] used for social media and social media storage" clause in the search warrant for apartment Unit #1 in this case is unconstitutionally overbroad. See Dkt. 33-1 at 2. Here, the object of the search—evidence of a dispute between Ms. Haney and Ms. Allen—was not, in any level of detail, set forth in the search warrant. The court, mindful of the care courts have exercised in Fourth Amendment issues surrounding cell phones, recommends that the warrant, as read within its four corners,[7] fails to meet the particularity requirement. See Galpin, 720 F.3d at 449-50 (invalidating warrant authorizing seizure of computers and electronic storage devices because those provisions described only places to be searched, not the underlying evidence of information sought).

---

[7] The court notes that Detective Dunn's affidavit—which cannot be considered for this particularity analysis because it was not incorporated into the warrant—identifies the evidence to be seized from the social media devices: "[Y]our affiant request[s] permission to search [the apartment] for any item related to a dispute between Christina Haney and Jasmine Allen. Detectives will be searching for any device used to convey social or store social media . . . ." The level of specificity contained in the affidavit would probably satisfy the particularity requirement.

18

### 4.    The Final Clause in the Warrant Is Unconstitutionally Overbroad.

Ms. Saddler argues that the "any . . . item related to aggravated assault" clause in the warrant makes this case analogous to United States v. LeBron, 729 F.2d 533, 537 (8th Cir. 1984), and permitted officers to engage in a boundless search of her apartment.  See Dkt. 33 at 6-9.  The court agrees with Ms. Saddler in part[8] and finds that the final clause in the warrant fails to meet the particularity requirement.

---

[8] Ms. Saddler cites United States v. Barnes, 749 F. Supp. 2d 1124 (D. Idaho 2010), in support of her position.  Barnes is distinguishable.  In Barnes, the defendant's girlfriend reported multiple instances of physical abuse by the defendant.  749 F. Supp. 2d at 1127-28.  One such instance of abuse involved Barnes pointing a loaded silver revolver at her.  Id.  The girlfriend also described to police that the defendant had other guns, including a sawed-off shotgun, and knives.  Id. at 1128.  Based on the girlfriend's account, police obtained a warrant to search Barnes' home.  Id.  Instead of obtaining a warrant for the items for which police had probable cause to search, namely the silver revolver and—quite possibly—the sawed-off shotgun (id. at 1130), police obtained a warrant that authorized them to search for, among other things, "[f]irearms, knives and other instrumentalities of injury, ammunition, holsters, cases, magazines, portions or elements of ammunition or other items associated with firearms, knives and other instrumentalities of injury."  Id. at 1128-29.  The district court found that the warrant was unconstitutionally overbroad because police could have described the items to be seized—the revolver and the shotgun—with more particularity in light of the information available to them but did not.  Id. at 1133-34.  Here, unlike in Barnes, the issue is not whether police "knew exactly what [they] wanted and needed," but failed to identify those items in the warrant.  Id. at 1134.  When Detective Dunn drafted the warrant, he did not know what forms evidence of the shooting might take.  Indeed, the warrant could have included a valid generic class of items, but instead it included the "item[s] related to aggravated assault" catch-all clause.  See Dkt. 33-1 at 2.  Thus, the issue in this case is not whether police could have included a catch-all clause in the warrant, but whether the catch-all clause in the warrant is a constitutional generic class of items.

19

First, the court is not persuaded by the government's conclusory argument that the "item[s] related to aggravated assault" clause is sufficiently specific to satisfy the warrant requirement. <u>See</u> Dkt. 39 at 6. While it is true that some catch-all provisions may validly describe generic classes of items, others are unconstitutionally overbroad. For the reasons stated below, the court finds that this clause is not particularized and does not constitute a valid generic class of items because, like the invalid generic catch-all clause in <u>LeBron</u>, the final clause in this warrant fails to relate the evidence sought to the specific criminal activity being investigated.

The Eighth Circuit in <u>LeBron</u> recognized that "when it is impossible to describe the fruits of a crime, approval has been given to a description of a generic class of items." <u>Id.</u> at 536-37 (citing <u>Spinelli</u>, 382 F.2d 871).[9] In <u>Spinelli</u>, the Eighth Circuit rejected the argument that a search warrant authorizing the seizure of "bookmaking paraphernalia" was unconstitutionally overbroad and reasoned that "law enforcement officials have practically no way of ascertaining in advance of a search exactly what sort of innocent, everyday materials and equipment utilized for gaming purposes might be in a private dwelling." 382 F.2d at 886. The <u>LeBron</u> court did not abrogate the holding

---

[9] The Court notes that, similar to <u>LeBron</u>, the court in <u>Barnes</u> discussed the validity of warrants for generic categories of items, albeit in the context of Ninth Circuit law: "Still, the court in <u>Millender</u> went on to explain that the rule that police must have probable cause for each and every item of search does not always invalidate warrants authorizing a search for classes of generic items." <u>Barnes</u>, 749 F. Supp. 2d at 1132 (citing <u>Millender v. County of Los Angeles</u>, 620 F.3d 1016, 1025 (9th Cir. 2010), <u>rev'd on other grounds</u>, <u>Messerschmidt v. Millender</u>, 565 U.S. 535 (2012)).

from <u>Spinelli</u>.  Instead, the court held that "the general description of 'property
. . . believe[d] to be stolen' is not a description of a generic class.  In fact, it is
not descriptive at all.  It is simply conclusory language." <u>LeBron</u>, 729 F.2d at
537.  The warrant in this case is analogous to the <u>LeBron</u> warrant; "item[s]
related to aggravated assault" is not a valid description of a generic class.  It is
"not descriptive at all" because it fails to identify the specific criminal activity
the search related to. <u>Id.</u>

　　　　"Mere reference to 'evidence' of a violation of a broad criminal statute or
general criminal activity provides no readily ascertainable guidelines for the
executing officers as to what items to seize." <u>George</u>, 975 F.2d at 76.
Similarly, "[a] failure to describe the items to be seized with as much
particularity as the circumstances reasonably allow offends the Fourth
Amendment." <u>Id.</u>  In <u>George</u>, the warrant authorized police to seize "any other
evidence relating to the commission of a crime." <u>Id.</u> at 75.  The Second Circuit
rejected the government's argument that the warrant, when read in the context
of an unincorporated supporting affidavit, the broad catchall phrase refers only
to the robbery at issue because "[n]othing on the face of the warrant tells the
searching officers for what crime the search is being undertaken." <u>Id.</u> at 75-76.
The Second Circuit concluded: "Although we have upheld warrants authorizing
the seizure of 'evidence,' 'instrumentalities' or generic classes of items where a
more precise description was not possible in the circumstances, *the warrants
in those cases identified a specific illegal activity to which the items related.*" <u>Id.</u>
at 76 (emphasis added).  "Absent some limitation curtailing the officers'

discretion when executing the warrant, the safeguard of having a magistrate [judge] determine the scope of the search is lost.  As a consequence, authorization to search for 'evidence of *a* crime,' that is to say, any crime, is so broad as to constitute a general warrant."  Id.

While the warrant at issue in George broadly authorized police to seize any item which may be evidence of any crime, other courts have applied the Second Circuit's reasoning to warrants authorizing police to seize evidence related to unspecified criminal conduct or violation of a statute.  See Rickert v. Sweeney, 813 F.2d 907, 909 (8th Cir. 1987) (while reference in a warrant to a crime may limit the scope of the search, the named statute must refer to an identifiable offense, rather than to a broad range of crimes, so that the instrumentalities of the crime may be readily ascertained); United States v. Dickerson, 166 F.3d 667, 694 (4th Cir. 1999) (internal quotation omitted) (finding that a warrant authorizing a search for evidence related to "a broad criminal statute or general criminal activity, such as wire fraud, fraud, conspiracy, or tax evasion, is overbroad because it provides no readily ascertainable guidelines for the executing officers as to what items to seize"), rev'd on other grounds, 530 U.S. 428 (2000); United States v. Rosa, 626 F.3d 56, 62 (2d Cir. 2010) ("The warrant was defective in failing to link the items to be searched and seized to the suspected criminal activity.").  See also United States v. Roche, 614 F.2d 6, 8 (1st Cir. 1980) (holding that a limitation of the search at issue to evidence related to a violation of 18 U.S.C. § 1341 provided "no limitation at all" because that statute is extremely broad in scope); Voss v.

22

Bergsgaard, 774 F.2d 402, 405 (10th Cir. 1985) (invalidating warrant that "refer[red] to the general conspiracy statute, but [wa]s not couched in terms that clearly restrict seizure to evidence relevant to the violation of the statute"); United States v. Drebin, 557 F.2d 1316, 1322 (9th Cir. 1977) (finding that warrant failed to describe with particularity items to be seized where it authorized police to seize, in part, "books, records, papers and other documents . . . which are the fruits and instrumentalities of violations of [18 U.S.C. §§ 371 and 2314]"), reh. aff'd in part, rev'd in part on other grounds, 572 F.2d 215, cert. denied, 436 U.S. 904 (1978); United States v. Lake, 233 F. Supp. 2d 465, 471 (E.D.N.Y. 2002) (finding that "generic terms may be used to describe the materials to be seized so long as the warrant identifies a specific illegal activity to which the item related"); In re Application of Madison, 687 F. Supp. 2d 103, 111-12 (E.D.N.Y. 2009) (references to criminal conduct in "truly vague terms" are not sufficiently particular).

In contrast, courts—including the Eighth Circuit—have found that generic classes of items meet the particularity requirement when they fairly limit the search to items related to the specific criminal activity being investigated.  See United States v. Conley, 4 F.3d 1200, 1204, 1208 (3d Cir. 1993) (finding warrant, which included the catch-all language "any and all paraphernalia indicative of a gambling operation," satisfied the particularity requirement because it fairly limited the items to be seized to the illegal gambling operation being investigated); United States v. Dennis, 625 F.2d 782, 792 (8th Cir. 1980) (upholding a warrant which called for seizure of "certain

books and records (or items of evidence) relating to the extortionate credit transaction business"); United States v. McClintock, 748 F.2d 1278, 1282-83 (9th Cir. 1984) (approving warrant containing the language "any and all items referring to the sale of diamonds and other gemstones which are evidence of a violation of Title XVIII, [U.S.C.] §§ 1342 and 1343" because it adequately specified the subject of the investigation); United States v. Bevins, No. 14-cr-123 (RHK/LIB), 2014 WL 12693887, at *8, *12 (D. Minn. July 29, 2014) (finding warrant which, after an extensive list of particular items, authorized the seizure of "[a]ny evidence related to the sexual exploitation of children" to be a valid generic class of items under Spinelli), adopted by, 2014 WL 12693898 (D. Minn. Sept. 16, 2014); Dickerson, 166 F.3d at 693-94 (emphasis added) (quotations omitted) (recognizing that warrants identifying items to be seized as "evidence of [a] [*specific* crime]" are sometimes upheld as constitutional "where a more precise description was not possible in the circumstances" and finding that a warrant that authorized a search for "evidence of the crime of bank robbery" was sufficiently particular because bank robbery tends to generate the same sort of "distinctive evidence" every time it is committed).

Here, the warrant failed to specify with any measure of particularity the criminal activity being investigated.  Instead, it named only the yet-uncharged criminal offense of aggravated assault.  See Dkt. 33-1 at 1 (indicating that the property to be seized is "[e]vidence of the commission of a criminal offense, to wit: Aggravated Assault").  The warrant authorized police to seize "any other

24

item related to aggravated assault" (Dkt. 33-1 at 2) without identifying the specific criminal activity under investigation. Aggravated assault covers, as Ms. Saddler notes, a wide range of criminal activity including such diverse acts as serious physical assaults, pointing a gun at someone, and discharging a gun at someone. See Rickert, 813 F.2d at 909 (instrumentalities of a crime are not readily ascertainable when the referenced crime does not of itself identify the specific criminal activity).

Police here could not have supplied a reasonably specific description of the criminal activity under investigation. According to Detective Dunn's affidavit, which the court does not consider in its particularity analysis because the affidavit was not incorporated into the warrant, police had a wealth of information that they could have included in the warrant. Police had probable cause to believe the "aggravated assault" they were investigating was a multiple-victim firearm shooting that took place shortly after 1:00 PM on June 9, 2019, that the shooter drove away in a black Buick sedan primarily driven by but not registered to Ms. Haney, that the motive may have been tied to a social media dispute between Ms. Haney and Ms. Allen, that the shooting may have been precipitated by a man entering then exiting 120 N. Cliff Avenue shortly before shots were fired, and that the shell casings left by the shooter were .40 caliber. See Dkt. 33-2 at 2-3.

Police included none of this information about the criminal activity under investigation in the warrant. Instead, the warrant merely states the unidentifiably broad criminal offense of aggravated assault. The complete lack

of particularity in this clause cannot be saved by its reference to a broad criminal offense.  See Dickerson, 166 F.3d at 684 (internal quotations omitted) (A warrant authorizing a search for evidence related to "a broad criminal statute or general criminal activity, such as wire fraud, fraud, conspiracy, or tax evasion, is overbroad because it provides no readily ascertainable guidelines for the executing officers as to what items to seize.").  Although this case presents a situation amenable to a generic class of items because police could not have known what form evidence of the shooting might take, the final clause in the warrant is an invalid generic class because it fails to relate the evidence sought to the crime committed.

The court finds that this clause is "not descriptive at all" (LeBron, 729 F.2d at 537) and is "defective in failing to link the items to be searched and seized to the suspected criminal activity" (Rosa, 626 F.3d at 62).  The warrant contains no limiting language to guide the officers' search and protect Ms. Saddler from an unconstitutional general search.

For these reasons, the warrant, within its four corners, fails to meet the particularity requirement.  The court finds and recommends that the search warrant be held invalid because it is unconstitutionally overbroad.

## B.    The Search Warrant Was Adequately Supported by Probable Cause.

"When the affidavit supporting the search warrant sets forth facts sufficient to create a fair probability that evidence of a crime will be found in the place to be searched, probable cause exists."  United States v. McIntyre, 646 F.3d 1107, 1115 (8th Cir. 2011) (quoting Unites States v. McArthur, 573

F.3d 608, 613 (8th Cir. 2009) (quoting United States v. Terry, 305 F.3d 818, 822 (8th Cir. 2002))).  See also Illinois v. Gates, 462 U.S. 213, 238 (1983). "Probable cause requires only a showing of fair probability, not hard certainties." United States v. Hudspeth, 525 F.3d 667, 676 (8th Cir. 2008). Whether a search warrant is supported by probable cause is to be determined by considering the totality of the circumstances.  United States v. Grant, 490 F.3d 627, 632 (8th Cir. 2007).  The issuing judge's determination of the issue of probable cause should be paid "great deference."  United States v. O'Dell, 766 F.3d 870, 873 (8th Cir. 2014).

Reviewing courts examine the sufficiency of an affidavit in support of a search warrant using "common sense," not a "hypertechnical" approach. Grant, 490 F.3d at 632 (citing United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005) (quoting United States v. Williams, 10 F.3d 590, 593 (8th Cir. 1993))).  "When the [issuing judge] relied solely upon the supporting affidavit to issue the search warrant, only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." O'Dell, 766 F.3d at 874.  See also Hudspeth, 525 F.3d at 674; United States v. Olvey, 437 F.3d 804, 807 (8th Cir. 2006).  Because nothing in the record suggests the state magistrate judge relied on any information outside of Detective Dunn's affidavit in issuing the warrant, the court's probable cause analysis is limited to the affidavit's contents.

A defendant seeking to suppress evidence obtained under a regularly issued search warrant has the burden to show by a preponderance of the

evidence that the search warrant was not supported by probable cause.  United States v. Chaar, 137 F.3d 359, 363 (6th Cir. 1998); United States v. De La Fuente, 548 F.2d 528, 534 (5th Cir 1977), cert. denied, 431 U.S. 932.  Cf. Carter v. United States, 729 F.2d 935, 940 (8th Cir. 1984) (generally, the burden is on the defendant who moves to suppress evidence except where the search was without benefit of a search warrant).

Ms. Saddler argues that probable cause to search her apartment did not exist.  Ms. Saddler has failed to meet her burden.

Detective Dunn's affidavit sets forth sufficient facts from which the issuing judge found probable cause to believe the apartment contained evidence of the shooting.  First, police received information that the shooting was related to a dispute on social media between Ms. Haney and Ms. Allen. They also knew that Ms. Allen's brothers, along with others, went to 120 N. Cliff Avenue to "settle" this dispute.  That is, police had reason to believe the group of men, including the Allen brothers who were shot, went to 120 N. Cliff Avenue in relation to Ms. Haney.  Shorting before the shooting, one man from this group entered then exited 120 N. Cliff Avenue.  Police also received information from Ms. Carr that Ms. Haney lived in Unit 1 and that the vehicle the shooter drove from the scene was primarily used by Ms. Haney.  Thus, not only did police have reason to believe the motive for the shooting was connected to Unit 1, they also had reason to believe the shooter was connected to Unit 1.

Police also saw the video camera in the southwest-most window of the apartment during the protective sweep and from the parking lot. Based upon its vantage, police had reason to believe any footage of the shooting that camera may have recorded constituted evidence of the crime. Considering the totality of this evidence, Ms. Saddler has not met her burden to show that the affidavit does not set forth facts supporting a fair probability that evidence of the shooting was in the apartment.

Ms. Saddler also argues that police lacked probable cause to search her apartment to the exclusion of the other three apartments at 120 N. Cliff Ave. In support of her position, Ms. Saddler points to the fact that the Dakota Auto Supply surveillance video first shows a man from the group of approximately seven enter then exit 120 N. Cliff Avenue, but not what he did inside, then shows the shooter exiting 120 N. Cliff Avenue, but not the particular apartment he exited. Although this characterization of the video is accurate, the court disagrees with the conclusion Ms. Saddler draws from the evidence. When Detective Dunn drafted the affidavit and warrant, there was ample evidence, as discussed above, connecting Unit 1 to the shooting. Nothing in the record suggests that there was anything close to a fair probability that evidence of the shooting was present in any other apartment at 120 N. Cliff Avenue.

## C. The Good-Faith Exception to the Exclusionary Rule Applies to the Warrant.

"The Fourth Amendment commands that no warrants shall issue, but upon probable cause, supported by Oath or affirmation." United States v. Fiorito, 640 F.3d 338, 345 (8th Cir. 2011). "The ordinary sanction for police

violation of Fourth Amendment limitations has long been suppression of the evidentiary fruits of the transgression." Id. "Yet, this exclusionary rule does not apply 'when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate [judge] and acted within its scope.' " United States v. Jackson, 784 F.3d 1227, 1231 (8th Cir. 2015) (quoting United States v. Leon, 468 U.S. 897, 921 (1984)).

"Under the good-faith exception, evidence seized pursuant to a search warrant later determined to be invalid will not be suppressed if the executing officer's reliance upon the warrant was objectively reasonable." Jackson, 784 F.3d at 1231 (citing United States v. Proell, 485 F.3d 427, 430 (8th Cir. 2007)). To determine whether the good-faith exception applies, the court examines the "objectively ascertainable question of whether a reasonably well-trained officer would have known that the search was illegal despite a judge's issuance of the warrant." Jackson, 784 F.3d at 1231 (citing Proell, 485 F.3d at 430). "In assessing the objective reasonableness of a police officer's execution of a warrant, we must look to the totality of the circumstances, including any information known to the officer but not presented to the issuing judge." Jackson, 784 F.3d at 1231 (citing Leon, 468 U.S. at 955).

There are four situations when the good-faith exception would not apply:

> (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge;

> (2) when the issuing judge "wholly abandoned his judicial role" in issuing the warrant;

30

> (3) when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" and
>
> (4) when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid.

United States v. Puckett, 466 F.3d 626, 630 (8th Cir. 2006) (citing Leon, 468 U.S. at 923).

There is no evidence in the record that either of the first three situations when the good-faith exception would not apply are present here. That is, neither party has presented any evidence that Detective Dunn's affidavit in support of the warrant intentionally misled the state-court judge or that the judge abdicated its judicial role in issuing the warrant. And, the court has already found that Detective Dunn's affidavit contains adequate facts in support of a finding of probable cause. See Puckett, 466 F.3d at 630. The court therefore addresses the applicability of the fourth situation.

Ms. Saddler argues that the shotgun should be suppressed because the warrant "was so facially deficient in detail . . . that the officers could not have reasonably presumed the warrant valid." See Dkt. 33 at 9 (quoting Barnes, 749 F. Supp. 2d at 1136). Ms. Saddler also cites Groh v. Ramirez, where the Supreme Court "held that the Leon good-faith exception to the exclusionary rule did not entitle officers to qualified immunity after they conducted a search based on a warrant that failed to identify the items that officers intended to

seize and did not incorporate by reference the itemized list that was contained in the warrant application." Szczerba, 897 F.3d at 938.

In Groh, police brought neither the warrant application nor the affidavit to the place to be searched because both were placed under seal. Groh, 540 U.S. at 558. The warrant failed to identify *any* items to be seized. Id. at 554. The court concluded that the good faith exception did not apply because "even a cursory reading of the warrant in this case—perhaps just a single glance— would have revealed a glaring deficiency that any reasonable police officer would have known was constitutionally fatal." Id. at 564. The standard set forth by the Supreme Court in Leon provides that suppression is appropriate when, "depending on the circumstances of the particular case, a warrant [is] so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." Leon, 468 U.S. at 923.

The court finds that the warrant in this case is not so facially deficient that no reasonable officer could presume it to be valid. The Eighth Circuit's reasoning in United States v. Szczerba is instructive. In Szczerba, the Eighth Circuit distinguished Groh and found, in a case where the search warrant did not identify the items to be seized, that the good-faith exception may still apply when certain factors are present. Szczerba, 897 F.3d at 936. The Eighth Circuit held that "the warrant was not so obviously deficient that any reasonable officer would have known it was constitutionally fatal." Id. at 938. "Important to the court's analysis was that the warrant specifically identified

'the places to be searched,' it 'specifically referred to [law enforcement's] affidavit,' the 'issuing judge signed the supporting affidavit' and that law enforcement 'brought both the affidavit and the warrant . . . to supervise the search[.]' " United States v. Janis, No. CR 17-50076-JLV, 2019 WL 913160, at *5 (D.S.D. Feb. 25, 2019) (quoting Szczerba, 897 F.3d at 938-39). The Szczerba warrant did not incorporate its supporting affidavit and it referred to the affidavit only in the averment of probable cause. Szczerba, 897 F.3d at 937. The Eighth Circuit found that these factors distinguished Szczerba from Groh. Id. at 939.

Here, the warrant identified items to be seized, albeit in an insufficiently particular way. Yet, Detective Dunn and Officer Jorgensen testified that their search was limited to cameras, storage devices, including items as small as SIM cards, social media devices, and evidence of the shooting—items they believed the warrant authorized them to seize. There is no evidence in the record that police engaged in a general rummaging through Ms. Saddler's belongings outside the scope of what they believed the warrant authorized them to do. Therefore, the court finds that the officers acted with objectively reasonable reliance on the warrant issued by the state judge. See Jackson, 784 F.3d at 1231 ("Under the good-faith exception, evidence seized pursuant to a search warrant later determined to be invalid, will not be suppressed if the executing officer's reliance upon the warrant was objectively reasonable.").

However, even if the warrant utterly failed to identify any items to be seized, the Szczerba factors weigh in favor of applying the good-faith exception.

33

In this case, three of these factors are clearly present, and the final factor is present at least in part.  First, the affidavit specifically identified Ms. Saddler's apartment as the place to be searched.  See Dkt. 33-1 at 1-2.  The warrant specifically referred to Detective Dunn's affidavit in the averment of probable cause.  See id. at 1.  A state magistrate judge reviewed and signed the affidavit. See id. at 2.  As for the fourth factor, Officer Jorgensen testified that the warrant was delivered to 120 N. Cliff Avenue to, in the Eighth Circuit's words, "supervise the search."  Szczerba, 897 F.3d at 939.  Neither Detective Dunn nor Officer Jorgensen testified that a copy of Detective Dunn's affidavit was present at the scene for the search.   Yet, Officer Jorgensen testified that detectives briefed him on what items they were authorized to seize.  Based on the record before it, the court concludes the Leon good-faith exception applies because police acted in objective good faith in obtaining the search warrant and acting within its scope.  This finding is further supported by the presence of multiple factors from Szczerba in support of the officers' good-faith execution of the search warrant.

Further, "[n]ot every Fourth Amendment violation results in exclusion of the evidence obtained pursuant to a defective search warrant."  United States v. Hamilton, 591 F.3d 1017, 1027 (8th Cir. 2010).  Because the exclusionary rule's purpose is to "safeguard Fourth Amendment rights generally through its deterrent effect" (Herring v. United States, 555 U.S. 135, 139-40 (2009) (quoting United States v. Calandra, 414 U.S. 338, 348 (1974)), it "applies only where it 'result[s] in appreciable deterrence.' "  Id. at 141 (quoting Leon, 468

U.S. at 909).  "Exclusion 'almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence,' <u>Davis v. United States</u>, 564 U.S. 229, 237 . . . (2011), and can result in 'letting guilty and possibly dangerous defendants go free—something that "offends basic concepts of the criminal justice system," ' <u>Herring</u>, 555 U.S. at 141 (quoting <u>Leon</u>, 468 U.S. at 908)."  <u>Szczerba</u>, 897 F.3d at 938.  "For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs."  <u>Davis</u>, 564 U.S. at 237.

In recent decisions, the Supreme Court has "recalibrated [its] cost-benefit analysis in exclusion cases to focus on the 'flagrancy of the police misconduct' at issue.' " <u>Id.</u> at 238 (quoting <u>Leon</u>, 468 U.S. at 911).  "[W]hen police mistakes are the result of negligence . . . rather than systemic error or reckless disregard of constitutional requirements, any marginal deterrence does not 'pay its way.' " <u>Herring</u>, 555 U.S. at 147-48 (quoting <u>Leon</u>, 468 U.S. at 907-08 n.6).

Here, the police mistake of drafting a facially deficient warrant was the result of negligence and inexperience (it was Detective Dunn's first search warrant application) rather than systemic error or reckless disregard for the constitution.  There is no indication in the record that police acted in bad faith when preparing and executing the warrant.  Instead, the record reflects that police were responding to a rapidly developing multi-victim shooting and searched the apartment within the scope of a warrant they believed to be valid.  Ms. Saddler suggests police could have seized the security camera from the window during their protective sweep.  But instead, in a clear attempt to

35

comply with the Fourth Amendment, they secured the apartment and sought a search warrant for its seizure.  The court concludes the Leon good-faith exception to the exclusionary rule applies in this case.  Any marginal deterrence from the suppression of the shotgun in this case does not "pay its way."  Leon, 468 U.S. at 907-08 n.6.

**D.    Officer Jorgensen's Seizure of the Shotgun Was Justified Under the Plain View Exception to the Warrant Requirement.**

The plain view exception to the warrant requirement allows an officer to "seize an object in plain view provided the officer is lawfully in the position from which he or she views the object, the object's incriminating nature is immediately apparent, and the officer has a lawful right of access to the object."  United States v. Hastings, 685 F.3d 724, 729 (8th Cir. 2012) (quoting United States v. Darr, 661 F.3d 375, 379 (8th Cir. 2011)).  "Seizures under the plain view doctrine are only justified when they meet the probable cause standard and are not accompanied by unlawful trespass.  The doctrine merely reflects application of the Fourth Amendment."  United States v. Chandler, 18 F. Supp. 2d 1240, 1255 (D. Kan. July 22, 1998) (citing Soldal v. Cook County, Ill. et al., 506 U.S. 56, 66 (1992)).  When a warrantless search occurs, the burden is on the government to show by a preponderance of the evidence that an exception to the warrant requirement applies.  Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971); United States v. Kennedy, 427 F.3d 1136, 1140 (8th Cir. 2005).

Here, the officers acted in good faith reliance on an unconstitutionally overbroad search warrant.  Therefore, the first question the court must decide

36

is whether the police officers executing an overbroad search warrant in good faith meet the first requirement for the application of the plain-view doctrine: the officer must not violate the Fourth Amendment in arriving at the place from which they viewed the evidence in the open. Horton v. California, 496 U.S. 128, 136 (1990).

Although the Eighth Circuit has not ruled on this question, several other courts have. Some courts have reasoned that any search conducted under an invalid warrant, whether Leon applies or not, cannot support the seizure of items under the plain-view doctrine because such a search violates the Fourth Amendment. See United States v. Riley, 906 F.2d 841, 852 (2d Cir. 1990) (Weinstein, J., dissenting) (rejecting the government's argument that items seized from plain view during the execution of an invalid search warrant should be admitted because the officers acted in good faith because "[s]uch an analysis relying on good faith and plain view completely eviscerates any protection against general warrants. It would allow officers to enter a person's home with an invalid warrant, albeit one that they believed in good faith to be valid. They could then search anywhere in the home for anything listed in the invalid warrant, and anything else they found during the course of that search could be seized as being in 'plain view.' This is precisely the kind of rummaging exploratory search forbidden by the Fourth Amendment."). See also United States v. Bluebird, No. CR 06-50006-01 & 03, 2006 WL 8444793, at *4 (D.S.D. Aug. 30, 2006) (without analyzing good faith, holding that the plain-view doctrine did not apply to items seized from plain view during the

execution of an invalid warrant because, "[i]f the search warrant is invalid, the officers are not rightfully there to observe anything, and therefore, plain view does not apply"); Chandler, 18 F. Supp. 2d at 1254-55 (without analyzing good faith, suppressing items seized from plain view during execution of an invalid search warrant because warrant violated the Fourth Amendment); United States v. Cobb, 970 F.3d 319, 331 (4th Cir. Aug. 11, 2020) (without analyzing good faith, noting that a finding that the entire warrant is invalid would require suppression of evidence found in plain view); George, 975 F.2d at 79 (without analyzing good faith, holding that, *where the warrant as a whole is not invalid*, a redacted warrant may justify the police intrusion, thus permitting the admission of items found in plain view).

Yet, other courts have, with specific consideration of Leon, found good-faith reliance on an invalid warrant to permit application of the plain-view doctrine.  See United States v. Legg, 18 F.3d 240, 244 (4th Cir. 1994) (admitting evidence under the plain-view doctrine "because the deputies possessed an objectively reasonable belief that the warrant was valid, they were lawfully present in Legg's apartment during execution of the warrant"), cert. denied, 512 U.S. 1244; United States v. Wolfe, 22 F. Supp. 2d 627, 641 n.3 (E.D. Mich. Sept. 1, 1998) ("Assuming *arguendo* that the warrant was invalid as to the search of the residence, but that the Leon decision's good faith exception is applicable, this Court would still find that the officers were lawfully searching the defendant's residence for purposes of the plain view doctrine."). See also United States v. Hirsch, No. CR01-3024 MWB, 2002 U.S. Dist. LEXIS

27324, at *6-7 (N.D. Iowa Feb. 20, 2002) (finding that police lawfully searched a vehicle in plain view while they were executing a subsequently invalidated warrant to which the <u>Leon</u> good-faith exception applied); <u>United States v. Owen</u>, 621 F. Supp. 1498, 1507-08 (E.D. Mich. 1985) (finding officers lawfully present for purposes of the plain-view doctrine if <u>Leon</u> good faith applies); <u>United States v. Bullard</u>, No. 95-5785, 1996 WL 683790, at *3 (4th Cir. Nov. 27, 1996) (following <u>Legg</u> and finding that the application of <u>Leon</u> good faith made the search lawful so that the plain-view doctrine applies); <u>United States v. Morris</u>, 904 F.2d 518, 519 (9th Cir. 1990) (holding that plain view requirement that there be a prior justification of the officer's presence would be satisfied by the good-faith exception even if the warrant was invalid); <u>United States v. Thomas</u>, No. 5:16-cr-001, 2016 WL 7324095, at *11 (W.D. Va. Dec. 15, 2016) (denying motion to suppress evidence of child pornography discovered during the warrant search of a cell phone SIM card where <u>Leon</u> good faith authorized the search and the plain-view doctrine justified the seizure); <u>Kykta v. Washington</u>, No. 96-1799, 1997 WL 58860, at *1-2 (7th Cir. Feb. 5, 1997) (affirming the district court's admission of evidence under the plain-view doctrine because the good-faith exception satisfied the Fourth Amendment).

The district court in <u>Kytka</u>[10] reasoned:

> "Although the good-faith exceptions outlined in <u>Leon</u> and [<u>Massachusetts v. Sheppard</u>, 468 U.S. 981 (1984)] do not necessarily delineate the scope of the Fourth Amendment—as distinguished from the contours of the exclusionary rule—we

---

[10] The spelling of the plaintiff-petitioner's name differs in the district court's ("Kytka") and the Seventh Circuit's ("Kykta") opinions.  The Court does not know which is correct.

> nonetheless believe that an objectively reasonable belief in
> the validity of a search is sufficient to satisfy the first prong of
> the "plain view doctrine." A contrary rule would have little
> deterrent effect on law enforcement, since officers who
> possess a good-faith basis to believe that their intrusions are
> justified will also believe that they are entitled to seize
> patently incriminating evidence in their plain view. Thus,
> even though some articulations of the plain-view doctrine
> indicate that an officer must not have entered the house in
> violation of the Fourth Amendment, *e.g.*, <u>United States v.
> Willis</u>, 37 F.3d 313, 316 (7th Cir. 1994), we hold that an
> officer's good-faith reasonable belief that he complied with the
> Fourth Amendment is all that is required."

<u>United States ex rel. Kytka v. Washington</u>, 921 F. Supp. 499, 507 n.9 (N.D. Ill.

1996).

The court finds the latter cases persuasive because they specifically

address the plain-view doctrine in the context of invalidated warrants and <u>Leon</u>

good faith. That is, the <u>Leon</u> good-faith exception satisfies the Fourth

Amendment so as to justify the officers' presence in the apartment for purposes

of the plain-view doctrine. Therefore, because the government has carried its

burden to show that the officers acted in good-faith reliance on the invalid

warrant, the first requirement of the plain-view doctrine is met. Thus, Officer

Jorgensen was lawfully in the place where he viewed the firearm in plain view.

The court turns next to the "lawful right of access" requirement of the

plain-view doctrine. Officer Jorgensen testified that, when he was partially

finished searching the clothes on the shelf for storage devices as small as a SIM

card, he observed what he recognized to be the grip of a firearm. Had Officer

Jorgensen immediately recognized, without picking up the gun, that its barrel

was unlawfully short, his seizure of the shotgun would have unquestionably

fallen within the plain view doctrine.  But, this case is more nuanced.  Officer Jorgensen did not observe that the shotgun's barrel appeared to be too short until he picked up the firearm.  See Minnesota v. Dickerson, 508 U.S. 336, 375 (1993) (holding that if "police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object—*i.e.*, if its incriminating character [is not] immediately apparent—the plain-view doctrine cannot justify its seizure") (internal quotation and citations omitted).

Thus, Officer Jorgensen must have had a lawful justification for removing the shotgun from the shelf for the government to meet its burden and avail itself of the plain-view doctrine.  Whether Officer Jorgensen had a legal justification to pick up the firearm turns on two questions: (1) did Officer Jorgensen lawfully pick up the firearm in order to secure it, thereby placing him lawfully in a position to observe the barrel; or (2) did Officer Jorgensen pick up the firearm under the reasonable belief that the storage devices he believed the warrant authorized him to search for could have been under or behind it.

Officer Jorgensen testified that he removed the firearm because there was more to search on the shelf and because he wanted to secure it.[11]  The

---

[11] See Hr'g Tr. at 56-57 (Q. So why are you taking [the gun] out of the closet at that point?  A. Well, if I'm going to be searching the closet, I want to make sure that it's safe for me to be around.  Q. Okay.  Was there much behind there?  A. I don't know.  Q. So you don't know whether you were looking for SIM cards behind that firearm?  A. What's that now?  Q. So I mean, what were you looking for?  Once you see the firearm and take the clothes away, are you still looking for stuff back there?  A. All the clothes weren't away yet.  There was

government has shown by a preponderance of the evidence that Officer Jorgensen was lawfully justified in picking up the shotgun under a reasonable belief that the electronic devices he was searching for could have been behind or under it on the shelf.

To answer the first question, the court must determine whether it was reasonable under the Fourth Amendment for Officer Jorgensen to pick up the firearm in order to secure it.  See Brigham City, Utah v. Stewart, 547 U.S. 398, 403 (2006) (citations omitted) (stating that the "ultimate touchstone of the Fourth Amendment is reasonableness").  "[A] search or seizure carried out on a suspect's premises without a warrant is *per se* unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions based on the presence of 'exigent circumstances.' "  United States v. Antwine, 873 F.2d 1144, 1146 (8th Cir. 1989) (quoting Coolidge v. New Hampshire, 403 U.S. 443, 474-75 (1971)).  The Eighth Circuit has repeatedly justified warrantless seizures—including of firearms—based on exigent circumstances "where law enforcement officers have a 'legitimate concern for the safety of themselves or others.' "  United States v. Kuenstler, 325 F.3d 1015, 1021 (8th Cir. 2003) (quoting United States v. Vance, 53 F.3d 220, 222 (8th Cir. 1995)).  See United States v. Arcobasso, 882 F.2d 1304, 1307 (8th Cir. 1989); United States v. Robinson, 756 F.2d 56, 60 (8th Cir. 1985); and United States v. Malachesen, 597 F.2d 1232, 1233 (8th Cir. 1979).

---

still more to be searched up there.  Q. So you didn't put those things away. You pulled this out first?  A. I got the weapon out so I was safe, yes.).

However, courts have rejected the exigency argument with regard to the warrantless seizure of firearms when the guns at issue present no legitimate danger to police or civilians.  See United States v. Prather, 138 F. Supp. 3d 1059, 1066 (S.D. Iowa Oct. 14, 2015) (granting motion to suppress seizure of handgun from plain view and distinguishing Arcobasso, Robinson, and Malachesen on the basis that the handgun posed no legitimate danger to police because no civilians were present during the search and the government presented no evidence that the handgun posed any danger of accidental discharge); United States v. Bishop, 338 F.3d 623, 628 (6th Cir. 2003) ("[F]or the seizure of a gun in plain view (and which is not obvious contraband) to be reasonable under the Fourth Amendment, a police officer must reasonably believe, based on specific and articulable facts, that the weapon posed an immediate danger to officer or public safety."). See also United States v. Rodriguez, 601 F.3d 402, 408 (5th Cir. 2010) (upholding temporary seizure of firearm for security purposes where the specific circumstances of the situation made it plausible that someone could access the firearm and use it against police); United States v. Newsome, 475 F.3d 1221, 1226 (11th Cir. 2007) (finding that the warrantless seizure of a gun is objectively reasonable "when there is a real concern for the safety of the officers present or the public at large" (citing New York v. Quarles, 467 U.S. 649, 653 n.3 (1984))); Legg, 18 F.3d at 245 (upholding the seizure of a firearm during a search on the basis that "the loaded pistol posed a threat to the safety of those executing the search warrant, particularly when family members of Legg were present, one of

43

whom insisted on walking around the apartment while the deputies conducted the search"); Antwine, 873 F.2d at 1147 (recognizing that "a warrantless seizure of a weapon may be considered 'reasonable' within the meaning of the Fourth Amendment when justified by an officer's legitimate concern for someone's safety" (citing Quarles, 467 U.S. at 653 n.3)).

Indeed, the blanket proposition that law enforcement officers may manipulate any firearm they may stumble upon in plain view in the interest of officer safety offends Fourth Amendment principles.  See Richards v. Wisconsin, 520 U.S. 385, 394 (1997) ("If a *per se* exception were allowed for each category of criminal investigation that included a considerable—albeit hypothetical—risk of danger to officers . . . the Fourth Amendment's reasonableness requirement would be meaningless.").  Instead, "exigency . . . must be determined case by case based on the totality of the circumstances." Missouri v. McNeely, 569 U.S. 141, 151 (2013).

Here, Officer Jorgensen provided no testimony to support a belief "that his temporary seizure of the firearm [from the shelf] was necessary to avoid a specific, actual, imminent, or even possible risk to other officers" or himself. Prather, 138 F. Supp. 3d at 1067.  The government presented no evidence that there was danger posed by civilians present in or possibly entering the apartment during the search or that police reasonably believed the firearm posed a legitimate danger of accidental discharge.  Rather, police had already removed the only person in the apartment—Ms. Saddler—during their protective sweep and then secured the apartment until Detective Dunn arrived

with the warrant.  On the record before it, the court cannot conclude that " 'the exigencies of the situation' ma[d]e the needs of law enforcement so compelling that [a] warrantless [seizure] is objectively reasonable under the Fourth Amendment." Kentucky v. King, 563 U.S. 452, 452 (2011) (quoting Mincey v. Arizona, 437 U.S. 385, 394 (1978)).  Since no exigency permitted Officer Jorgensen to take the shotgun from the shelf and secure it, and because he did not observe anything incriminating about the gun until after he picked it up, concern for officer safety cannot justify the temporary seizure of the firearm.

However, Officer Jorgensen's temporary seizure of the firearm is justified by his ongoing search of the closet shelf for storage devices the size of a SIM card.  See Prather, 138 F. Supp. 3d at 1064 (distinguishing picking up a firearm in plain view for the sole purpose of securing it from picking it up in furtherance of the warrant search).  Here, Officer Jorgensen testified that the firearm was between clothing items when he first saw its grip, and, when he picked it up, there were still clothes to be searched on the shelf.  It is clear from the record that Officer Jorgensen moved the firearm so he could continue searching the clothing and shelf beneath and behind it.  Based on the record before it, the court concludes that the government has shown by a preponderance of the evidence that Officer Jorgensen temporarily seized the firearm in furtherance of his search for storage devices, which he undertook in objectively reasonable good-faith reliance on an unconstitutionally overbroad warrant.  Officer Jorgensen therefore had lawful access to the firearm.

45

The court turns now to whether the shotgun's incriminating nature was immediately apparent to Officer Jorgensen when he removed it from the shelf. "The 'immediately apparent' requirement [of the plain view doctrine] means that officers must have 'probable cause to associate the property with criminal activity.' " United States v. Brooks, 645 F.3d 971, 976 (8th Cir. 2011) (quoting United States v. Hatten, 68 F.3d 257, 261 (8th Cir. 1995)). "[P]robable cause demands not that an officer be 'sure' or 'certain' but only that the facts available to a reasonably cautious [person] would warrant a belief 'that certain items may be contraband or stolen property or useful as evidence of a crime.' " Hatten, 68 F.3d at 261 (quoting United States v. Garner, 907 F.2d 60, 62 (8th Cir. 1990)).

Here, the incriminating character of the shotgun was immediately apparent to Officer Jorgensen. Officer Jorgensen testified that, upon removing the gun from the shelf, it was immediately apparent to him that its barrel looked too short to be legal. His immediate impression was that this shotgun's barrel had been made shorter than the legal minimum length, which Officer Jorgensen knew to be 18 inches. Based on Officer Jorgensen's testimony, the court finds that the shotgun's incriminating character was immediately apparent to Officer Jorgensen because its appearance warranted his reasonable belief that it was a contraband firearm.[12]

---

[12] Both Officer Jorgensen and Agent Weise testified that the shotgun's front sight was missing from the end of the barrel. The Court does not consider this testimony in finding that Officer Jorgensen had probable cause to believe the shotgun was unlawfully short. While the front sight's absence is probative of

Ms. Saddler contends that police could not have appreciated the incriminating nature of the shotgun until after its barrel had been measured. She also argues that the post-seizure measurement of the barrel constitutes a manipulation proscribed by <u>Arizona v. Hicks</u>, 480 U.S. 321 (1987).  The court rejects both arguments.  Seizure of an item from plain view requires not that the item's incriminating nature be known as a certainty; all that is required is probable cause to associate the item with criminal activity.  <u>Hatten</u>, 68 F.3d at 261.  Here, Officer Jorgensen immediately associated the shotgun with criminal activity when he identified that the barrel appeared unlawfully short.  That Officer Jorgensen did not know the exact length of the barrel at the time he seized the shotgun does not disturb his reasonable belief that it was too short. Probable cause to believe the firearm was contraband existed based upon Officer Jorgensen's visual impressions alone.

Lastly, at the evidentiary hearing, Ms. Saddler made much of the fact that the shotgun's barrel was just barely over an inch under the legal minimum, a fact which, according to Ms. Saddler, undermines Officer Jogensen's probable cause to believe the barrel was unlawfully short.  The court is not persuaded.  That the barrel was arguably close to the lawful length is of no consequence.  Indeed, Officer Jorgensen could have, in like circumstances, lawfully seized a shotgun with a 19-inch barrel so long as he had probable cause to believe it was too short.  In this plain view analysis,

_____

the barrel having been shortened, it is only marginally probative of the real question here—whether the barrel had been shortened to less than 18 inches.

47

what matters is Officer Jorgensen's impression of the shotgun when he removed it from the shelf. He testified that he "immediately recognized [the gun] was too short to be legal."[13]  The court finds that Officer Jorgensen had probable cause to seize the shotgun from plain view based upon his reasonable belief that it was a contraband firearm.  See United States v. Story, 463 F.2d 326, 328 (8th Cir. 1972) (upholding seizure of sawed-off shotgun from plain view because its incriminating nature as a contraband firearm was immediately apparent to the seizing officer); United States v. Johnson, 541 F.2d 1311, 1316 (8th Cir. 1976) (same).  For these reasons, the government has met its burden to show by a preponderance of the evidence that the plain view exception to the warrant requirement applies.

## CONCLUSION

Based on the foregoing facts, law, and analysis, this magistrate judge respectfully recommends that defendant Martece Arielle Saddler's motion to suppress [Docket No. 33] be DENIED.  Accordingly, this magistrate judge recommends that defendant's custodial statements to police not be suppressed as fruit of the poisonous tree because there was no preceding Fourth Amendment violation.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely

---

[13] Hr'g Tr. at 61.

objections will result in the waiver of the right to appeal questions of fact.

Objections must be timely and specific in order to require de novo review by the

district court.  <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990); <u>Nash v. Black</u>,

781 F.2d 665 (8th Cir. 1986).

DATED this 10th day of September, 2020.

BY THE COURT:

_____
VERONICA L. DUFFY
United States Magistrate Judge

49